IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DEPARTMENT OF EDUCATION,          )     CIVIL 13-00322 LEK-RLP
STATE OF HAWAII,                  )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )
                                  )
Z.Y., by and through his          )
Parent, R.Y.,                     )
                                  )
          Defendants.             )
_____

**ORDER AFFIRMING IN PART AND REVERSING AND REMANDING
IN PART THE HEARINGS OFFICER'S MAY 30, 2013 DECISION**

Before the Court is Plaintiff Department of Education, State

of Hawaii's ("the DOE" or "Plaintiff") appeal from the

Administrative Hearings Officer's ("Hearings Officer") May 30,

2013 Findings of Fact, Conclusions of Law and Decision

("Decision"[1]), pursuant to the Individuals with Disabilities

Education Act of 2004 ("IDEA"), 20 U.S.C. § 1400 et seq.  The DOE

filed its opening brief on September 30, 2013.  [Dkt. no. 16.]

Defendants Z.Y. ("Student"), by and through his parent, R.Y.

("Father," collectively, "Defendants"),[2] filed their answering

_____

[1] The Decision is attached to the Complaint as Exhibit A,
and is also attached to the Administrative Record on Appeal
("ROA"), at 71-96.  The Court notes that the Hearings Officer
convened a hearing on March 11 and March 12, 2013 ("3/11/13
Hearing" and "3/12/13 Hearing," respectively).  [ROA at 2-3.]

[2] In the underlying administrative proceeding, Defendants
were the Petitioners, and the DOE was the Respondent.  For
clarity purposes, Petitioners' Exhibits are referred to as
                                        (continued...)

brief on October 18, 2013.  [Dkt. no. 18.]  The DOE filed its
reply brief on November 1, 2013.  [Dkt. no. 19.]  This appeal
came on for hearing on November 18, 2013.  Appearing on behalf of
the DOE was Michelle Puu, Esq., and appearing on behalf of
Defendants was Keith Peck, Esq.  After careful consideration of
the parties' briefs, and the arguments of counsel, the
May 30, 2012 Decision is HEREBY AFFIRMED IN PART AND REVERSED AND
REMANDED IN PART for the reasons set forth below.

**BACKGROUND**

At the time of the Decision, Student was five years old
and qualified to receive special education and related services
under the IDEA in the Autism category.  [Decision at 4 (citing
ROA, Pltf.'s Exh. 1, Exh. 3).]

During the 2011-2012 school year, Student attended
preschool at a public school for children ages three years to
fifth grade ("the Home School").  Student also began kindergarten
at the Home School for the 2012-2013 school year.  While Student
attended kindergarten at the Home School, he received his core
program in a fully self-contained special education classroom
with one-to-one Adult Support ("1:1 Adult Support") services.
[Id. at 4-5 & n.2 (citing ROA, Pltf.'s Exh. 5).]

I.   **September 14, 2012 Observation**

_____

    [2](...continued)
"Defendants' Exhibits," and Respondent's Exhibits are referred to
as "Plaintiff's Exhibits."

On September 14, 2012, Father and Student's mother ("Mother," collectively, "Parents"), the DOE Autism Consulting Teacher ("ACT"),[3] the DOE District Resource Teacher ("DRT"), and the Home School Psychologist observed Student at the Home School (the "9/14/12 Observation").[4]  [Id. at 5 (citing ROA, 3/11/13 Hrg. Trans. at 83; id., 3/12/13 Hrg. Trans. at 222, 250; id., Pltf.'s Exh. 26).]

Parents spent the entire school day at the Home School to learn Student's routine.  [Decision at 6 (citing ROA, 3/11/13 Hrg. Trans. at 128).]  Mother testified that, during the 9/14/12 Observation, Student displayed inappropriate behavior.  [Id. at 5-6 (citing ROA, 3/11/13 Hrg. Trans. at 84-86, 166; id., 3/12/13 Hrg. Trans. at 251).]  For example, Mother testified that: (1) Student was lying on the floor and leaning on the 1:1 Adult Support aide because Student did not want to wait for his peers to participate in calendar activity; [ROA, 3/11/13 Hrg. Trans. at 86;] and (2) the 1:1 Adult Support aide did not facilitate social interaction between Student and his peers, and Student did not respond to the 1:1 Adult Support aide [id. at 166].  [Decision at 6.]

---

[3] "The DOE ACT was qualified to testify as an expert in the area of educational programming for children with Autism. . . ." [Decision at 5 n.4.]

[4] The Court notes that these individuals appear to have made independent observations of Student on September 14, 2012.

Prior to the 9/14/12 Observation, the DOE ACT had also observed Student on September 4 and 13, 2012.  The DOE ACT testified that, when she observed Student on September 4, "Student was having difficulty with attention to task and compliance." [Id. at 5 n.4 (citing ROA, 3/12/13 Hrg. Trans. at 248, 268).]  On September 14, 2012, the DOE ACT began observing Student just before the lunch period, but did not observe Student engaging in inappropriate behavior during lunch, recess, or the time Student spent in the general education setting.  [Id. at 6-7 (citing ROA, 3/12/13 Hrg. Trans. at 262-63).]  Parents told the DOE ACT that Student needed more opportunities for socialization. The DOE ACT assured Parents that the Home School would target the socialization area for Student.  [Id. at 6 (citing ROA, 3/12/13 Hrg. Trans. at 251).]

## II.  October 12, 2012 Meeting

### A.  Individualized Education Program Discussion

Although Student's annual Individualized Education Program ("IEP") meeting was to be held in April 2013, a revision IEP meeting was also convened on October 12, 2012 ("the 10/12/12 Meeting").[5]  The following individuals attended the 10/12/12 Meeting:  Parents, the DOE ACT, the Home School Principal, two DOE special education teachers, the DOE Student Services

---

[5] Revision meetings for Student's IEP were also held on August 31, 2012 and September 21, 2012.  [Decision at 5 n.3.] These meetings, however, are not at issue in the instant action.

4

Coordinator ("SSC"), a DOE speech pathologist, and a certified occupational therapy assistant.[6]  The DOE Behavioral Health Specialist testified that she was also present at the 10/12/12 Meeting, although her name does not appear on the DOE's list of attendees.[7]  [Id. (citing ROA, Pltf.'s Exh. 5 at 38; id., 3/12/13 Hrg. Trans. at 201-02).]

        Mother testified that, at the 10/12/12 Meeting, Parents sought a discussion regarding the kind of support Student needed to be successful in the classroom, based in part on their 9/14/12 Observation.  Parents' concerns included, inter alia, "Student's challenging behaviors, his disengagement in the curriculum, the appropriateness of the lessons or tasks given to Student, and the lack of social interaction and/or facilitated opportunities for social interaction."  [Decision at 7-8 (quotation marks omitted) (citing ROA, 3/11/13 Hrg. Trans. at 82-83, 166).]  Mother testified that the DOE members told her that Student's challenging behaviors could be discussed later at a Behavior Support Team ("BSP") meeting.  [Id. at 8 (citing ROA, 3/11/13 Hrg. Trans. at 90).]

───────────────

        [6] The Court notes that, although it unclear from the ROA, the certified occupational therapy assistant appears to be a DOE employee.

        [7] The individuals at the 10/12/12 Meeting are collectively referred to as "the IEP team."  All members of the IEP team except Parents are referred to as "the DOE members."

Upon learning that the DOE ACT had also observed Student prior to the 9/14/12 Observation, Mother asked the DOE ACT to share what she had observed so that the IEP team could discuss Student's needs.  Mother testified that the DOE members did not want to discuss this matter, and that the DOE ACT informed her that "interventions for Student's inappropriate behaviors" could be discussed at a "team meeting," instead of an IEP meeting.  [Id. (citing ROA, 3/11/13 Hrg. Trans. at 89, 116).] Mother testified that she just wanted to discuss Student's needs and how the IEP team could provide support to help him be successful.  Mother wanted to talk about Student's observed behaviors, particularly those that the DOE employees had observed because they interacted with Student at school on a daily basis. [Id. (citing ROA, 3/11/13 Hrg. Trans. at 117).]

The Decision states:

> According to the DOE ACT, during a "team meeting," the DOE members of a child's IEP team (including the teacher and all of the child's direct services providers; a school administrator need not be present) and the child's parents discuss the child's progress – specifically what parts of the child's program is [sic] working for the child and what parts of the program are not working for the child.  If a strategy or intervention is not working for a child, why is the strategy or intervention not working?  The team meeting provides a forum to discuss the child's program and educate the parents about the necessary supports and strategies used to support the child's communication, social and behavioral needs.

[Id. at 21 n.14 (citing ROA, 3/12/11 Hrg. Trans. at 282).]  The

6

Home School Principal believes that the "primary goal for an IEP meeting is to discuss the Present Levels of Educational Performance ('PLEP'), IEP goals and objectives, services, and the Least Restrictive Environment ('LRE') for a child." [Id. at 11 (citing, ROA 3/12/13 Hrg. Trans. at 295-96).]

The DOE ACT testified that Parents' concerns at the 10/12/12 Meeting were: (1) Student's behavior; (2) the qualifications of his 1:1 Adult Support aide; and (3) that Student should spend more time in the general education setting. [Id. (citing ROA, 3/12/13 Hrg. Trans. at 256).]  The Home School Principal testified that the 10/12/12 Meeting was designed to address Parents' concerns, and that Parents wanted to discuss interventions and methodologies for Student.  Although the DOE members were open to discussing interventions at any meeting, they offered to discuss specific interventions at a team meeting. The Home School Principal agreed that interventions may be considered services, depending on the type of interventions being discussed.  [Id. at 10-11 & n.6 (citing, ROA 3/12/13 Hrg. Trans. at 295-96).]

The DOE ACT agreed that, at the 10/12/12 Meeting, Parents wanted to discuss the interventions Student needed in order to be successful in the classroom.  [Id. at 8 (citing ROA, 3/12/13 Hrg. Trans. at 272-73).]  The Decision states:

> The DOE ACT testified ". . . that it's very necessary, it's essential for the team to know

7

> about the child's behaviors in the classroom, how
> he orients himself, his attention, his intraverbal
> abilities, whether he is functioning in close
> proximity to his peers, whether he can make
> requests, the kind of accommodations that are
> provided to him that will benefit [him.]"

[Id. at 8-9 (citing ROA, 3/12/13 Hrg. Trans. at 273).]  The DOE

ACT also testified that, despite the above points being necessary

to design a child's program, the IEP team did not discuss any of

these points at the 10/12/12 Meeting.  [Id. at 9 (citing ROA,

3/12/13 Hrg. Trans. at 273).]

Mother further testified that, at the 10/12/12 Meeting,

she asked questions regarding how the Home School Principal was

going to implement his plan to have Student participate more in

the general education setting.  Mother wanted details as to how

the IEP team was going to work together to help Student succeed,

and that the IEP team concluded that they were going to follow

Student's existing IEP.  Mother, however, was unable to

participate in the discussion and receive answers to the

questions she wanted to ask.  [Id. (citing ROA, 3/11/13 Hrg.

Trans. at 118).]

Mother testified that she had also observed Student

during his after-school private tutoring sessions,[8] and had

requested video tapes of these sessions.  Mother testified that

---

[8] "When Student attended the [Home School], Parents provided
him with after school tutoring from the Private Tutoring
Service." [Decision at 15 (citing ROA, 3/11/13 Hrg. Trans. at
105).]

8

the video tapes of Student's tutoring sessions contained information regarding his challenging behaviors and food training issues.  Because Parents were concerned that Student was not eating at the Home School and was exhibiting challenging behaviors, Parents wanted to discuss these issues at the 10/12/12 Meeting for purposes of consistency in addressing Student's issues throughout the day.  [Id. at 9-10 (citing ROA, 3/11/13 Hrg. Trans. at 120-21).]  When Mother tried to discuss Student's needs at the 10/12/12 Meeting, the DOE members informed her that such issues were not at the Home School, and that Parents would need to bring the issues up at a team meeting or a BSP meeting. [Id. at 10 (citing ROA, 3/11/13 Hrg. Trans. at 121).]

### B.   Extended School Year Services Discussion

Mother testified that, at the 10/12/12 Meeting, Parents were also concerned about whether Student would be placed with non-disabled peers during his extended school year ("ESY") services.  After the 9/14/12 Observation, Parents wanted Student to have as much interaction with his typically developing peers as possible so that Student could observe how typical children interact and develop his own verbal skills.  Student did not have such opportunities for interaction in the special education resource room.  [Id. (citing ROA, 3/11/13 Hrg. Trans. at 93-94).]

At the 10/12/12 Meeting, the Home School Principal informed Mother that no regular education students attended ESY,

but that the YMCA or Extended Learning Opportunities ("ELO") might be available for Student. "Mother testified that the [Home School] Principal was unable to provide her with information about a program during ESY where Student would be integrated with his regular education peers." [Id. at 11-12 (citing ROA, 3/11/13 Hrg. Trans. at 130-31).] Another IEP meeting was to follow two weeks later. [Id. at 12 (citing ROA, 3/11/13 Hrg. Trans. at 133).]

The Home School Principal testified that Parents had asked about ESY services at the 10/12/12 Meeting, and that Student would receive summer ESY services. Because the Home School Principal was not sure as to what Student's summer ESY program entailed, he told Parents that he would look into it. The Home School Principal also testified that ESY services are traditionally provided for children with special needs, and not for general education students. Thus, general education students do not attend ESY services. [Id. (citing ROA, 3/12/13 Hrg. Trans. at 291; id., 3/11/13 Hrg. Trans. at 1-10).]

The Home School Principal testified that the Home School is affiliated with the YMCA, and that he was willing to try and work something out for Student's summer ESY program. [Decision at 12 (citing ROA, 3/12/13 Hrg. Trans. at 266, 292).] According to the DOE ACT, at the 10/12/12 Meeting, there was no discussion as to "whether it would be appropriate for Student to

be involved with regular education students during ESY of whether

Student would benefit from being included in an ESY program with

regular education students. [Id. (citing ROA, 3/12/13 Hrg. Trans.

at 271-72).]

    **C.**     **Student's October 12, 2012 IEP**

       The October 12, 2012 IEP provided Student with the

following services:

> (a) 1830 minutes/week of special education;
> (b) 540 minutes/quarter of speech-language
> therapy; (c) 120 minutes/quarter of occupational
> therapy; (d) daily transportation; (e) Extended
> School Year ("ESY") services after breaks from
> school that are longer than three weeks; and (f)
> Supplementary Aids and Services, Program
> Modifications and Supports for School Personnel -
> speech consultation/observation (60
> minutes/quarter); 1:1 Adult Support (1830
> minutes/week); Repeated Directions (daily); Parent
> Training (2 hours for the 1st month; 1 hour for
> each additional month); Sensory Strategies as
> needed (daily); Autism Consultation from 10/8/12-
> 12/17/12 (12 hours/month); and Autism Consultation
> from 1/2/13-4/24/13 (4 hours/month). . . .
>
> . . . .
>
> (a) From April 25, 2012 to July 19, 2012,
> Student will participate with general education
> peers for recess, morning exercise, lunch,
> assemblies, P.E., Fine Arts, Library, Hawaiian
> Studies, and appropriate field trips; and
> (b) From July 30, 2012 to April 24, 2013,
> Student will participate with his general
> education peers for recess, morning exercise,
> lunch, assemblies, P.E., Fine Arts, Library,
> Hawaiian Studies, appropriate field trips,
> Science, and Social Studies.  Student will not
> participate with his general education peers for
> Language Arts and Math.  For those two classes,
> Student will be placed in a small group setting.

[Id. at 7 (citing ROA, Pltf.'s Exh. 5 at 35-37).]

**III. Parents' Letters to the Home School Principal**

Parents wrote the Home School Principal a letter, dated October 18, 2012, regarding their concerns from the 10/12/12 Meeting and reiterating their request for: (1) a discussions of interventions for Student to be successful in the classroom; and (2) a discussion about whether Student would be with regular education students during his summer ESY program ("Parents' 10/18/12 Letter"). [Id. at 13 (citing ROA, Defs.' Exh. 2 at 11).[9]] In his response, dated October 31, 2012, the Home School Principal told Parents that conversations with respect to the issue of specific interventions and teaching methodology can be held during team meetings, and that the Home School was willing to hold team meetings to discuss Parents' concerns. [Id. at 13 (citing ROA, Pltf.'s Exh. 32 at 149).] The Home School Principal also told Parents that IEP meetings are for reviewing and revising the PLEP, goals and objectives, services, and LRE. With respect to the ESY issue, the Home School Principal informed Parents that ESY is designed for special education students who demonstrate a need for ESY services. Because general education students do not qualify, they do not receive ESY services. [Id.

---

[9] Defendant's Exhibit 2 consists of multiple letters between Parents and the Home School Principal that are not consecutively paginated. The page numbers in this Court's citations to Defendants' Exhibit 2 refer to the pages as they appears in the cm/ecf system.

(citing ROA, Defs.' Exh. 2 at 16;[10] id., Pltf.'s Exh. 32 at 149).]

Parents wrote the Home School Principal another letter, dated November 13, 2012, stating that Parents disagreed that: (1) Student did not require changes to his PLEP, goals and objectives, services, or LRE; and (2) specific interventions and teaching methodology can be discussed during team meetings.  The Home School Principal responded to Parents again, restating that IEP meetings are meant to address Student's program and placement.  Strategies, interventions, and methodologies, however, are not IEP issues, and that is why he previously offered to hold a team meeting.  [Id. at 13-14.]  Student left the Home School on November 9, 2012.  [Id. at 14 (citing ROA, 3/11/13 Hrg. Trans. at 135-36).]

## IV.  **The Private School**

Parents enrolled student in a small private school for typically developing students from kindergarten through twelfth grade ("the Private School").  "Mother testified that the Private School was one of the few schools open to Student and his disability, and allowed the Private Tutoring Service's tutors to accompany Student to school."  [Id. (footnote omitted) (citing ROA, 3/11/13 Hrg. Trans. at 97-98 & n.9).]  Before Student began

---

[10] The Court notes that Defendant's Exhibit 2 consists of only ten pages.

attending the Private School, Parents, Student's Private School teacher, and the Private Tutoring Service tutor discussed what Student would need to be successful in school.

Student attends class with typically developing peers. When Parents observed Student at the Private School, Student approached another peer to ask a question.  At the time, the Private Tutoring Service's tutor was standing behind the peer, holding a cue card for Student to read.  This helped Student to interact with the peer.  Parents have also observed that Student is slowly opening up to other children, including his non-disabled sibling.  [Id. at 14-15 (citing ROA, 3/11/13 Hrg. Trans. at 99-101).]

The Private Psychologist, who is the director of the Private Tutoring Service,[11] is responsible for designing applied behavioral analysis ("ABA") programs and overseeing their implementation.  She also generates educational programs.  [Id. at 15-16 (citing ROA, 3/11/13 Hrg. Trans. at 19-23).]  "Student's present program includes attending the Private School for the entire school day with 1:1 Adult Support service provided by Private Tutoring Service tutors; private occupational therapy lessons three times a week; and an after-school ABA program

---

[11] The Private Psychologist is a Board Certified Behavioral Analyst ("BCBA"), and was qualified to testify as an expert in the area of the design and management of autism behavior programs.  [Decision at 15 n.10.]

14

provided by Private Tutoring Service tutors and overseen by a BCBA." [Id. at 16 (citing ROA, Defs.' Exh. 13).]

At first, Student required full prompting from his tutor for all instructions and had difficulty staying on task. "Now, when presented with a worksheet, Student requires only minor prompts and may finish a worksheet semi-independently.  In spite of transitioning from a half-day of school to a full day of school in January 2013, Student's challenging behaviors have decreased, not increased." [Id. (citing ROA, 3/11/13 Hrg. Trans. at 29-30).]  The Private Psychologist testified that, although Student initially received most of the instruction from his Private Tutoring Service Tutor, in February 2013, Student began receiving instructions from the Private School teacher with the rest of the class.  "Student is making progress in the area of academic, social communication, and behavioral skills at the Private School and in his after-school program with the Private Tutoring Service." [Id. at 17 (citing ROA, Defs.' Exh. 3, Exh. 4).]

## V.  <u>Impartial Due Process Hearing</u>

On November 23, 2012, Defendants filed a request for an impartial hearing ("RIH").  The RIH originally alleged that the DOE denied Student a FAPE for the following reasons:

> a.   [Father] requested a discussion about his child's needs in the classroom.  He was seeking to discuss what classroom interventions his child needed to be successful.  He wanted this

discussion because simply stating that his child
would have "adult support" was not allowing him to
address what actual modifications and supports his
child needed.  If he could discuss the needs and
supports his child would benefit from, he could
then determine whether the designation "adult
support" was a sufficient label to ensure that his
child's needs would be met, or if that label,
"adult support" needed to be further specified.
The DOE prevented this discussion.

> b.   [Father] requested a discussion about
extended school year services and how and whether
his child would be provided inclusion
opportunities; time with non-disabled peers.  He
wanted inclusion opportunities for his child.  The
DOE would not discuss whether his child should be
provided inclusion opportunities.

> c.   [Father] discovered that his child's IEP
was not being implemented regarding the least
restrictive environment portion of the IEP.  The
DOE stated that his child's behaviors were
interfering with the implementation of the IEP.
Parent was not informed of these problems with the
implementation of the IEP.  If there were
behavioral problems preventing the implementation
of student's IEP, the DOE should have informed
parent and held an IEP meeting to address these
problems.

[ROA at 4-5.]  At the 3/11/13 Hearing, Parents withdrew the third

issue listed in the RIH, as well as Defendants' proposed Exhibits

8 and 13.  [Decision at 3 n.1 (citing ROA, 3/11/13 Hrg. Trans. at

6, 15-17).]

The Hearings Officer ultimately concluded that "by not

discussing Student's needs at the October 12, 2012 IEP meeting,

[the DOE] significantly impeded Student's right to a FAPE and

significantly impeded Parents' opportunity and ability to

participate in the decision-making process regarding the

16

provision of a FAPE to Student." [Id. at 23.]  Further, the
Hearings Officer found Student's program, consisting of the
Private School, the Private Tutoring Service, and the private
occupational therapy lessons, are appropriate.  Thus, the
Hearings Officer ordered the DOE to reimburse Parents for
Student's Private School tuition and other instructional and
related expenses, including occupational therapy and services
provided by the Private Tutoring Service, from November 11, 2012
through the end of the 2012-2013 school year, including ESY 2013.
[Id. at 24.]  The instant appeal followed.

**STANDARDS**

I.   **IDEA Overview**

        "The IDEA is a comprehensive educational scheme,
conferring on disabled students a substantive right to public
education and providing financial assistance to enable states to
meet their educational needs."  Hoeft ex rel. Hoeft v. Tuscon
Unified Sch. Dist., 967 F.2d 1298, 1300 (9th Cir. 1992) (citing
Honig v. Doe, 484 U.S. 305, 310 (1988)).  It ensures that "all
children with disabilities have available to them a free
appropriate public education that emphasizes special education
and related services designed to meet their unique needs and
prepare them for further education, employment, and independent
living[.]"  20 U.S.C. § 1400(d)(1)(A).

The IDEA defines a free appropriate public education ("FAPE") as

> special education and related services that –
>
> > (A) have been provided at public expense, under public supervision and direction, and without charge;
> >
> > (B) meet the standards of the State educational agency;
> >
> > (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> >
> > (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an individualized education program ("IEP").  See generally 20 U.S.C. § 1414.  The IEP is to be developed by an "IEP Team" composed of, inter alia, school officials, parents, teachers and other persons knowledgeable about the child.  20 U.S.C § 1414(d)(1)(B).

Compliance with the IDEA does not require school districts to provide the "absolutely best" or "potential-maximizing" education.  J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted).  Rather, school districts are

required to provide only a "'basic floor of opportunity.'"  Id.

(quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v.

Rowley, 458 U.S. 176, 201 (1982)).  The FAPE need only be

"appropriately designed and implemented so as to convey [the]

[s]tudent with a meaningful benefit."  Id. at 433 (citations and

quotation marks omitted).

        If a parent disagrees with the contents of an IEP, the

parent may challenge the contents thereof by demanding an

administrative due process hearing to be conducted by the local

or state educational agency.  See 20 U.S.C. § 1415(b)(6),

(f)(1)(A).

## II.  Standard of Review

        The standard for district court review of an

administrative decision under the IDEA is set forth in 20 U.S.C.

§ 1415(i)(2)(C), which provides:

> In any action brought under this paragraph, the
> court –
>         (i) shall receive the records of the
>         administrative proceedings;
>
>         (ii) shall hear additional evidence at the
>         request of a party; and
>
>         (iii) basing its decision on the
>         preponderance of the evidence, shall grant
>         such relief as the court determines is
>         appropriate.

        This standard requires that the district court give

"'due weight'" to the administrative proceedings.  L.M. v.

Capistrano Unified Sch. Dist., 556 F.3d 900, 908 (9th Cir. 2009)

19

(some citations omitted) (quoting Rowley, 458 U.S. at 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690).  The district court, however, has the discretion to determine the amount of deference it will accord the administrative ruling.  J.W., 626 F.3d at 438 (citing Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)).

In reaching that determination, the court should consider the thoroughness of the hearings officer's findings, increasing the degree of deference where said findings are "'thorough and careful.'" L.M. v. Capistrano, 556 F.3d at 908 (quoting Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995)).  The district court should give "substantial weight" to the hearings officer's decision when the decision "evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented." Cnty. of San Diego v. Cal. Special Educ. Hearing Office, 93 F.3d 1458, 1466-67 (9th Cir. 1996) (citation and quotation marks omitted)).  Such deference is appropriate because "if the district court tried the case anew, the work of the hearing[s] officer would not receive 'due weight,' and would be largely wasted." Wartenberg, 59 F.3d at 891.

The burden of proof in IDEA appeal proceedings is on the party challenging the administrative ruling.  Hood v. Encinitas Union Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007)

(citations omitted).  The challenging party must show, by a preponderance of the evidence, that the hearing decision should be reversed.  <u>J.W.</u>, 626 F.3d at 438 (citation omitted).

## DISCUSSION

As an initial matter, after careful consideration of the administrative record and the Hearings Officer's Decision, the Court finds that the May 30, 2013 Decision, in general, is sufficiently thorough and careful.  Where a decision contains some findings that are "thorough and careful," and others that are not, however, the court can give deference to the thorough and careful findings independently.  <u>See</u> <u>R.B., ex rel. F.B. v. Napa Valley Unified School Dist.</u>, 496 F.3d 932, 943 (9th Cir. 2007) ("[W]e accord particular deference to the [hearings officer's] 'thorough and careful' findings . . . although we independently review the testimony in the record that [he] failed to consider.").  Accordingly, the Court finds that the Hearings Officer's findings and conclusions are entitled to increased deference, with some exceptions noted below.  <u>See</u> <u>L.M.</u>, 556 F.3d at 908.  The Court now turns to the merits of the case.

The DOE argues that the Hearings Officer erred in making several findings in the Decision, including her ultimate finding that Parents are entitled to reimbursement from the DOE. The Court first sets forth the applicable standards with respect to reimbursement for private placement.  The Court then

addresses: (1) whether the Hearings Officer erred in finding that the DOE denied Student a FAPE; (2) whether the Hearings Officer erred in finding that the Private School was an appropriate placement for reimbursement purposes.

## I.   **Legal Framework**

The DOE argues that the Hearings Officer erred in awarding reimbursement to Parents.  [Opening Br. at 19, 35.]  In determining whether a qualified disabled student is entitled to reimbursement for a private placement from the State under the IDEA, this district court has set forth a three-step analysis:

> First, the court asks whether the school district violated the IDEA, either "procedurally" or "substantively." Rowley, 458 U.S. at 206–07, 102 S. Ct. 3034.  A school district may violate the IDEA's statutory or regulatory procedures in creating or implementing (or failing to create or implement) an IEP.  Id.  Or a school district may violate the IDEA substantively by offering an IEP that is not reasonably calculated to enable the child to receive educational benefit.  Id.  The school district must provide the student with a FAPE that is "appropriately designed and implemented so as to convey" to the student a "meaningful" benefit.  J.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 433 (9th Cir. 2010) (quoting Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999)).
>
> Second, if the IDEA's procedures are violated, the next question is whether that violation denied that student a FAPE-for not all procedural violations are actionable.  See, e.g., L.M. v. Capistrano v. Unified Sch. Dist., 556 F.3d 900, 909 (9th Cir. 2009); 20 U.S.C.

§ 1415(f)(3)(E)(ii).[12]  The procedural violation must result in the "loss of [an] educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process."  Id. (quoting W.G. v. Bd. of Trs. of Target Range Sch. Dist., 960 F.2d 1479, 1484 (9th Cir. 1992)).  That is, "where a procedural violation does not result in a lost education opportunity for the student, the violation is 'harmless error' because it does not deny the student a FAPE."  R.B. v. Napa Valley Unified Sch. Dist., 496 F.3d 932, 938 n.4 (9th Cir. 2007) (quoting M.L. v. Fed. Way Sch. Dist., 394 F.3d 634, 651-52 (9th Cir. 2005) (Gould, J. concurring)).

The third stage is the remedy-and this stage itself includes several steps.  If an IDEA violation results in denial of a FAPE, a district court has discretion to "grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  Such relief could include reimbursement for a private placement.  See 20 U.S.C. § 1412(a)(10)(C)(ii); Sch. Comm. of Burlington v. Dep't of Ed. Of Mass., 471 U.S. 359, 370, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985).  It can also include compensatory education as "appropriate equitable relief."  Park v. Anaheim

---

12 Section 1415(f)(3)(E)(ii) provides:

In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies–

(i) impeded the child's right to a free appropriate public education;

(ii) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

(iii) caused a deprivation of educational befits.

Union High Sch. Dist., 464 F.3d 1025, 1033 (9th
Cir. 2006).  The parent or guardian, however must
also establish that the particular private
placement is itself "appropriate."  See, e.g.,
Ashland Sch. Dist. v. Parents of Student E.H., 587
F.3d 1175, 1183 (9th Cir. 2009).  That is, "where
Parents seek reimbursement for private school
expenses, they 'are entitled to reimbursement *only*
if a federal court concludes both that the public
placement violated the IDEA and that the private
school placement was proper under the Act.'"  Id.
(quoting Florence Cnty. Sch. Dist. Four v. Carter
ex rel. Carter, 510 U.S. 7, 15, 114 S. Ct. 361,
126 L. Ed. 2d 284 (1993)).  "The latter
requirement [(the appropriateness of private
placement)] is essential to ensuring that
reimbursement awards are granted only when such
relief further the purposes of the [IDEA]."
Forest Grove Sch. Dist. v. T.A., 557 U.S. 230,
242, 129 S. Ct. 2484, 2493 n.9, 174 L. Ed. 2d 168
(2009).

Dep't of Educ., State of Haw. v. M.F. ex rel. R.F., 840 F. Supp.

2d 1214, 1226-27 (D. Hawai`i 2011) (some alterations in original)

(emphasis in original) (some footnotes omitted).

## II.  **Denial of FAPE**

In the Decision, the Hearings Officer concluded that

"by not discussing Student's needs at the October 12, 2012 IEP

meeting, [the DOE] significantly impeded Student's right to a

FAPE and significantly impeded Parents' opportunity and ability

to participate in the decision-making process regarding the

provision of a FAPE to Student."  [Decision at 23.]  The Hearings

Officer also found that "[t]he October 12, 2012 IEP was not

appropriate[.]"  [Id. at 24.]  Insofar as the Hearings Officer

appears to have concluded that the DOE committed both procedural

24

and substantive violations of the IDEA, the Court will review
both findings.

A.   **Procedural Violation**

The DOE argues that the Hearings Officer erred in
finding that the DOE committed a procedural violation of the
IDEA, and therefore denied Student a FAPE.  [Opening Br. at 24,
33 (citing Decision at 23).]

The Hearings Officer notes, and the DOE actually
emphasizes, that the October 12, 2012 Meeting was an IEP revision
meeting, and not Student's annual IEP meeting.  [Decision at 5
n.3; Opening Br. at 27 n.8.]  In conducting an IEP revision
meeting, the IDEA requires the IEP team to review existing
evaluation data.  Section 1414(c)(1) states, in pertinent part:

> Review of existing evaluation data
>
> As part of any initial evaluation (if appropriate)
> and as part of any reevaluation under this
> section, the IEP Team and other qualified
> professionals, as appropriate, shall--
>
>> (A) review existing evaluation data on the
>> child, including--
>>
>>> (i) **evaluations and information provided
>>> by the parents of the child;**
>>>
>>> (ii) current classroom-based, local, or
>>> State assessments, **and classroom-based
>>> observations**; and
>>>
>>> (iii) **observations by teachers and
>>> related services providers**; and
>>
>> (B) on the basis of that review, and **input**

25

**from the child's parents**, identify what additional data, if any, are needed to determine--

(i) whether the child is a child with a disability as defined in section 1401(3) of this title, and the educational needs of the child, or, in the case of a reevaluation of a child, whether the child continues to have such a disability and such educational needs;

(ii) the present levels of academic achievement and related developmental needs of the child;

(iii) whether the child needs special education and related services, or in the case of a reevaluation of a child, whether the child continues to need special education and related services; and

(iv) whether any additional modifications to the special education and related services are needed to enable to the child to meet measurable annual goals set out in the individualized education program of the child and to participate, as appropriate, in the general education curriculum.

(Emphases added.)  "'The Act imposes upon the school district the duty to conduct a meaningful meeting with the appropriate parties.'"  N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Dirs., Missoula Cnty., Mont., 541 F.3d 1202, 1209 (9th Cir. 2008) (quoting W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23, 960 F.2d 1479, 1485 (9th Cir. 1992)).  The Ninth Circuit has emphasized that a school district cannot abdicate its affirmative duties under the IDEA.  Id. at 1209.

26

The Hearings Officer concluded that, by preventing Parents from discussing Student's needs at the 10/12/12 Meeting, the DOE "significantly impeded Parents' opportunity and ability to participate in the decision-making process regarding a provision of a FAPE to Student." [Decision at 23.]  The Court finds that the Hearings Officer's Decision with respect to this issue is thorough and careful.  The Hearings Officer's Decision notes several occasions where Mother testified that, when Parents attempted to address Students' challenging behaviors and classroom needs, the DOE members prevented such discussion.  [Id. at 8-10.]  Mother also had information about Student's behavior that she had obtained during observations of Student at the Private Tutoring Service, and requested a discussion regarding Student's behavior.  [Id. at 9.]  Instead, the DOE members rebuffed Mother's request, and told Parents that such discussion topics were more appropriate for a team meeting or a BSP meeting. [Id. at 8-10.]  Mother also testified that she wanted the DOE ACT to share her observations from the 9/13/12 Observation and have the IEP team discuss Student's needs, but the IEP team did not want to discuss this subject either.  [Id. at 8.]

### 1.   IEP Discussion

According to the DOE, despite Mother's testimony that she wanted to discuss certain topics at the 10/12/12 Meeting, she was unable to state the specific ways in which she communicated

her desires for discussion to the IEP team.  [Opening Br. at 29 (citing ROA, 3/11/13 Hrg. Trans. at 116-17, 119-23).]  The DOE asserts that, at the 10/12/12 Meeting, Mother merely said, "[n]ot a satisfactory response, but let's move on."  [Id. at 30 (citing ROA, Defs.' Exh. 8; id., 3/12/13 Hrg. Trans. at 269-70).]  The DOE argues that, insofar as Parents did not ask follow-up questions at the 10/12/12 Meeting, the DOE members could not have been expected to know that Parents wanted more discussion. [Opening Br. at 33.]  The Court notes, however, that in conducting a reevaluation of Student at the 10/12/12 Meeting, the IEP team had a duty under the IDEA to review existing data, including information provided by Parents and the DOE ACT. See 20 U.S.C. § 1414(c)(1)(A)(i), (iii).  The DOE also had a duty to allow for Parents' meaningful participation in the 10/12/12 Meeting.  See W.G., 960 F.2d at 1485.  These are affirmative duties that the DOE cannot abdicate.  See N.G., 541 F.3d at 1209- 10.  Thus, the Court emphasizes that, when Parents indicated that the DOE members' responses were "not satisfactory," the DOE's duties under the IDEA required the DOE members to inquire further as to why Parents believed the DOE's responses to be unsatisfactory.  The DOE members' failure to do so significantly infringed on Parents' right to participate in the IEP process. The Court therefore AFFIRMS the Hearings Officer's finding that Student was denied a FAPE.

28

2.  **ESY Discussion**

The Court notes that the Hearings Officer did not make an express finding that the DOE also committed a procedural violation by impeding on Parents' opportunity to participate in the discussion regarding ESY at the 10/12/12 Meeting.  The Decision states: "Whether or not Student would be mainstreamed with non-disabled children during the summer ESY session was not discussed because the [Home School] Principal did not have sufficient information regarding the summer ESY session during Fall 2012." [Decision at 22.]  Furthermore, the Hearings Officer found that the topics Parents wanted to discuss generally at the 10/12/12 Meeting may have been beneficial to determining Student's ESY summer program.  The DOE argues that, contrary to the Hearings Officer's conclusion, the evidence suggests that the ESY issue was raised, Parents provided input, and Parents received an adequate response.  [Opening Br. at 29.]

After reviewing the administrative record, the Court concludes that the conduct of the DOE members with respect to the ESY discussion at the 10/12/12 Meeting did not amount to a violation of the IDEA.  Although the Hearings Officer found that the IEP team did not discuss whether Student should be mainstreamed during ESY, the evidence indicate that the Home School Principal addressed Parents' concerns for ESY.  The Decision notes that the Home School Principal testified that,

29

because ESY is generally only provided to qualifying disabled students, he was unsure as to the availability of ESY programs with inclusion opportunities.  [Decision at 11-12 (citing ROA, 3/11/13 Hrg. Trans. at 130-31).]  The Home School Principal further testified that he told Parents that he would look into ESY program options for Student, including ones at the Home School, and that another IEP meeting was scheduled two weeks after the 10/12/12 Meeting.  [Id. at 12 (citing ROA, 3/12/13 Hrg. Trans. at 291-92.]  The DOE ACT also testified that the Home School Principal told Parents that "'we could work something out' with regard to Student's ESY Program."  [Id. (quoting ROA, 3/12/13 Hrg. Trans. at 266).]

> This district court has stated:
>
> The IDEA requires that "to the maximum extent appropriate" students with disabilities
>
> > are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.
>
> 20 U.S.C. § 1412(a)(5)(A).  Known as "mainstreaming" or the "least restrictive environment" ("LRE"), this provision is designed to indicate a strong preference within the IDEA for educating handicapped with nonhandicapped children as much as possible.  See Board of Education v. Rowley, 458 U.S. 176, 181 n.4 (1982); id. at 202 ("The Act requires participating States to educate handicapped

children with nonhandicapped children whenever possible.").

C.P. v. Hawaii, CV. No. 09-00393 DAE-BMK, 2010 WL 1962944, at *7 (D. Hawai`i May 17, 2010); see also Park ex rel. Park v. Anaheim Union High Sch. Dist., 464 F.3d 1025, 1034-35 (9th Cir. 2006) (recognizing that the district court affirmed the hearings officer's grant of relief to the student for the district's failure to provide an ESY program in the LRE). In T.M. ex rel. A.M. v. Cornwall Central School District, the court stated:

> Courts in other circuits have held that a district that does not operate a mainstream educational program during the summer is not obligated to create one simply to satisfy the LRE requirements of the IDEA. See T.R. v. Kingwood Township Bd. of Educ., 205 F.3d 572, 579 (3d Cir. 2000) ("a district that does not operate a regular . . . program is not required to initiate one simply in order to create an LRE opportunity for a disabled child," but should assess mainstream classroom options "within a reasonable distance"); Travis G. v. New Hope-Solebury Sch. Dist., 544 F. Supp. 2d 435, 443 (E.D. Pa. 2008); Reusch v. Fountain, 872 F. Supp. 1421, 1448 (D. Md. 1994) ("the Court does not read the IDEA to mandate indifference to legitimate practical considerations or interference with other school programming to create artificial LRE settings during the summer months.").

900 F. Supp. 2d 344, 352-53 (S.D.N.Y. 2012).

The Hearings Officer's findings reflect that, like T.M., this is not a case where the DOE failed to offer Student an LRE with respect to his ESY summer program, but one where the issue is whether least-restrictive placement options even exist. See id. at 353 (citing J.G. ex rel. N.G. v. Kiryas Joel Union

Free Sch. Dist., 777 F. Supp. 2d 606, 655 (S.D.N.Y. 2011)).  The
Hearings Officer notes the Home School Principal's testimony
that, at the time of the 10/12/12 Meeting, he was unsure as to
whether inclusion opportunities were available through the Home
School.  [Decision at 12.]  The Court finds that the lack of
discussion regarding whether Student would receive inclusion
opportunities during his ESY program, before the IEP team had
sufficient information that such programs even exist, did not
amount to a procedural violation of the IDEA.  Thus, to the
extent that the Hearings Officer's conclusion that Student was
denied a FAPE is based on her finding that the 10/12/12 Meeting
lacked a discussion regarding inclusion opportunities for Student
in his ESY program, the Decision is HEREBY REVERSED.

    **B.   Substantive Violation**

        The DOE argues that the Hearings Officer erred in
finding that the lack of discussion at the 10/12/12 Meeting
amounted to a substantive violation of the IDEA, and denied
Student a FAPE.  [Opening Br. at 19.]

        The Court finds that the Hearings Officer's decision is
not sufficiently thorough and careful with respect to this
finding, and therefore accords it less deference.  Nothing in the
administrative record or the Hearings Officer's Decision
indicates that Parents claimed that Student's October 12, 2012
IEP was inadequate or inappropriate.  Thus, the Court concludes

that the Hearings Officer exceeded the scope of her jurisdiction in making such a determination.  See Hawai`i Dep't of Educ. v. D.K. ex rel. N.K., Civ No. 05-00560 ACK/LEK, 2006 WL 1646093, at *4 (D. Hawai`i June 6, 2006) ("[A] hearings officer should limit the issues he considers in reaching his determination to those that were raised prior to the hearing."); see also Dep't of Educ., Hawai`i v. C.B. ex rel. Donna B., Civil No. 11-000567 SOM/RLP, 2012 WL 1537454, at *8 (D. Hawai`i May 16, 2013) (holding that the hearings officer erred by considering issues that petitioners had not raised in their due process complaint). The Court HEREBY REVERSES the Hearings Officer's Decision with respect to the finding that the October 12, 2012 IEP was not appropriate.

In summary, the Court finds that the DOE failed to prove by a preponderance of the evidence that there were no IDEA violations.  The Court HEREBY AFFIRMS the Hearings Officer's finding that the DOE procedurally violated the IDEA in preventing Parents from participating in the 10/12/12 Meeting, and denied Student a FAPE.  Insofar as the Court upholds the Hearings Officer's finding as to this issue, the Court next considers whether the Private School was an appropriate placement for student for reimbursement purposes.

## III. **Appropriateness of the Private School**

The DOE argues that the Hearings Officer made no findings of fact to support her conclusion that the Private School was appropriate for reimbursement purposes.  [Opening Br. at 33.]  The DOE asserts that, without any evidence that the Private School provided specialized instruction to meet Student's needs, the Hearings Officer erred in awarding reimbursement to Parents.  [Id. at 35.]

The Ninth Circuit has stated:

> Even if a parent prevails on an IDEA claim, however, reimbursement is not automatic and the Supreme Court has repeatedly cautioned that "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 373–74, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985).

Anchorage School Dist. v. M.P., 689 F.3d 1047, 1058-59 (9th Cir. 2012).

Under 34 C.F.R. § 300.148(c), reimbursement for private school expenditures is available

> [i]f the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private preschool, elementary school, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made

34

> FAPE available to the child in a timely
> manner prior to that enrollment and that the
> private placement is appropriate.

34 C.F.R. § 300.148(c).

The Ninth Circuit adopted the following standard in determining what constitutes a "proper" placement within the meaning of the IDEA:

> To qualify for reimbursement under the IDEA,
> parents need not show that a private placement
> furnishes every special service necessary to
> maximize their child's potential.  They need only
> demonstrate that the placement provides
> educational instruction specially designed to meet
> the unique needs of a handicapped child, supported
> by such services as are necessary to permit the
> child to benefit from instruction.

C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist., 635 F.3d 1155, 1159 (9th Cir. 2011) (emphasis omitted) (some citations omitted) (quoting Frank G. v. Bd. of Educ., 459 F.3d 356, 365 (2d Cir. 2006)).

With respect to this issue, the Court finds that the Hearings Officer's Decision is not sufficiently thorough or careful to warrant more than minimal deference.

First, the Court notes that the Hearings Officer did not make an express finding as to whether Parents provided adequate notice to the DOE before removing Student from the Home School for reimbursement purposes.  See 20 C.F.R.

§ 300.148(d)(1)(i)-(ii).[13]  Parents' 10/18/12 Letter expresses

their belief that the Home School failed to offer Student a FAPE,

and their intention of removing Student from the Home School and

to seek reimbursement for private placement.  [ROA, Pltf.'s Exh.

32 at 148.]  Parents removed Student from the Home School on

November 9, 2012.  [Id., 3/11/13 Hrg. Trans. at 135-36.]  The

Court therefore finds that Parents provided adequate notice to

the DOE for reimbursement purposes.

     Second, the Court also finds that there is insufficient

evidence to support a finding that the Private School provided

---

[13] 20 C.F.R. § 300.148(d)(1)(i) and (ii) provide:

> The cost of reimbursement described in paragraph
> (c) of this section may be reduce or denied--
>
> (1) If--
>
> > (i) At the most recent IEP Team meeting
> > that the parents attended prior to
> > removal of the child from the public
> > school, the parents did not inform the
> > IEP team that they were rejecting the
> > placement proposed by the public agency
> > to provide FAPE to their child,
> > including stating their concerns and
> > their intent to enroll their child in a
> > private school at public expense; or
> >
> > (ii) At least ten (10) business days
> > (including any holidays that occur on a
> > business day) prior to the removal of
> > the child from the public school, the
> > parents did not give written notice to
> > the public agency of the information
> > described in paragraph (d)(1)(i) of this
> > section[.]

36

educational instruction specially designed to meet Student's unique needs.  Mother testified that, before Student began attending the Private School, Parents, Student's Private School teacher, and the Private Tutoring Service tutor discussed what Student would need to be successful in school.  [ROA, 3/11/13 Hrg. Trans. at 98.]  Even if this discussion identified, and gave thoughtful consideration to, all of Student's unique needs, it does not necessarily follow that the Private School provided educational instruction to meet all of Student's needs.  The Private Psychologist testified that there are no special education teachers at the Private School to work with Student, and that Student receives instruction from the Private School teacher with other students.  [Id. at 55.]  The Private Tutoring Service then provides additional, individualized education and prompts to Student.  [Id.]  Although the Private Psychologist testified that the Private School teacher was receptive to feedback from the Private Tutoring Service regarding Student, her testimony does not reflect the quality of educational instruction that the Private School provides Student.  The evidence in the administrative record indicates that Student has made progress since Parents enrolled him in the Private School.  A discussion of Student's needs and indications of his progress, however, do not support a conclusion that the Private School is appropriate for reimbursement purposes.  At most, the Private Psychologist's

37

testimony establishes that the Private School's educational instruction is supported by services necessary to permit Student to benefit from instruction.  See C.B., 635 F.3d at 1159.

Furthermore, in reviewing the administrative record, the services that Student receives from the Private Tutoring Service appears to be independent from the Private School's program.  In fact, the evidence shows that Parents had already been sending Student to the Private Tutoring Service while he was attending the Home School.  [Decision at 9 (citing ROA, 3/11/13 Hrg. Trans. at 120-21).]  Mother's testimony shows that Parents' decision to enroll Student in the Private School was based, at least in part, on its willingness to allow the Private Tutoring Service's tutor to accompany Student to school.  [Id. at 14 (citing ROA, 3/11/13 Hrg. Trans. at 97-98).]

The Court emphasizes that, despite being prevented from discussing their desired topics at the 10/12/12 Meeting, Parents' unilateral decision to remove Student from the Home School and to place him in the Private School was at their own financial risk. See Anchorage Sch. Dist., 689 F.3d 1058-59.  While the Court finds that the DOE failed to provide Student with a FAPE, it cannot determine with certainty the appropriateness of his placement at the Private School.  Thus, the Court HEREBY REVERSES the Hearings Officer's Decision with respect to her findings that the Private School was appropriate, and that Parents are entitled

to reimbursement from the DOE.  The Court therefore REMANDS this case to the Hearings Officer for the limited purpose of conducting further proceedings on the issue whether Student's private placement was appropriate.

## CONCLUSION

On the basis of the foregoing, the Court HEREBY AFFIRMS IN PART AND REVERSES IN PART the Hearings Officer's Findings of Fact, Conclusions of Law and Decision of May 30, 2013.  The Court REVERSES the Hearings Officer's Decision to the extent that:

1) the Court concludes that the lack of discussion as to whether Student would receive inclusion opportunities during his ESY summer program at the 10/12/12 Meeting did not violate the IDEA;

2) the Court concludes that the Hearings Officer exceeded her jurisdiction in finding that the October 12, 2012 IEP was inappropriate; and

3) the Court concludes that the administrative record does not support a finding that the Private School was an appropriate placement for Student for reimbursement purposes.

The Court therefore REMANDS the Findings of Fact, Conclusions of Law and Decision of May 30, 2013 for further proceedings as to the issue of the appropriateness of Student's private school placement for the purpose of reimbursement.  The Court AFFIRMS the Decision in all other respects.

//

//

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, November 27, 2013.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

DEPARTMENT OF EDUCATION, STATE OF HAWAII VS. Z.Y., BY AND THROUGH
HIS PARENTS R.Y; CIVIL 13-00322 LEK-RLP; ORDER AFFIRMING IN PART
AND REVERSING AND REMANDING IN PART THE HEARINGS OFFICER'S
MAY 30, 2013 DECISION